UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——

|  |  |  |
|---|---|---|
| TERRY A. BEATY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:10-cv-894 |
| | ) | |
| v. | ) | Honorable Paul L. Maloney |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| _____ | ) | |

       This is a social security action brought under 42 U.S.C. §§ 405(g), 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security denying plaintiff's claims for disability insurance benefits (DIB) and supplemental security income (SSI) benefits for the closed period from September 8, 2004, through April 22, 2008.  On September 9, 2005, plaintiff filed her applications for benefits alleging a September 8, 2004 onset of disability.[1]  (A.R. 66-68).  Plaintiff's claims for DIB and SSI benefits were denied on initial review.  (A.R. 45-48).  On February 26, 2008, she received a hearing before an administrative law judge (ALJ), at which she was represented by counsel.  (A.R. 396-424).  On April 22, 2008, the ALJ issued a decision finding that plaintiff was

---

[1]SSI benefits are not awarded retroactively for months prior to the application for benefits. 20 C.F.R. § 416.335; *see Kelley v. Commissioner*, 566 F.3d 347, 349 n. 5 (3d Cir. 2009); *see also Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir.2004).  The earliest month in which SSI benefits are payable is the month after the application for SSI benefits is filed.  Thus, October 2005 is plaintiff's earliest possible entitlement to SSI benefits.

not disabled.  (A.R. 15-21).  On July 29, 2010, the Appeals Council denied review (A.R. 5-8), and

the ALJ's decision became the Commissioner's final decision.

On September 10, 2010, plaintiff filed her complaint seeking judicial review of the

Commissioner's decision denying her claims for DIB and SSI benefits.  Plaintiff asks the court to

overturn the Commissioner's decision on the following grounds:

1.     The ALJ committed reversible error in this case by failing to find that the Plaintiff
       met Listings 12.05B or C; and

2.     "The ALJ did not have substantial evidence to support his finding that Plaintiff could
       have performed medium work, and his conclusion that she could violated the treating
       physician rule."

(Statement of Issues, Plf. Brief at 9, docket # 13).  Alternatively, plaintiff seeks an order remanding

this matter to the Commissioner for consideration of new evidence under sentence six of 42 U.S.C.

§ 405(g).  Upon review, I find that plaintiff has not carried her statutory burden for an order

remanding this matter to the Commissioner for consideration of new evidence.  I further find that

plaintiff's arguments do not provide any basis for disturbing the Commissioner's decision.  I

recommend that the Commissioner's decision be affirmed.

## Standard of Review

When reviewing the grant or denial of social security benefits, this court is to

determine whether the Commissioner's findings are supported by substantial evidence and whether

the Commissioner correctly applied the law.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124,

125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Substantial evidence is

defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007).

The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the

evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Walters*

*v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any

fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see*

*McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the

Commissioner are not subject to reversal merely because there exists in the record substantial

evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within

which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73.

"If supported by substantial evidence, the [Commissioner's] determination must stand regardless of

whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v.*

*Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996)

("[E]ven if the district court -- had it been in the position of the ALJ -- would have decided the

matter differently than the ALJ did, and even if substantial evidence also would have supported a

finding other than the one the ALJ made, the district court erred in reversing the ALJ."). "[T]he

Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of

the evidence supports the claimant's position, so long as substantial evidence also supports the

conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003).

**<u>Discussion</u>**

The ALJ found that plaintiff met the disability insured requirement of the Social

Security Act  from September 8, 2004, through the date of the ALJ's decision. (A.R. 18). Plaintiff

-3-

had not engaged in substantial gainful activity on or after September 8, 2004. (A.R. 18). Plaintiff

had the following severe impairments: "narcolepsy, depression, a learning disability and

ch[r]ondromalacia involving the patella." (A.R. 18). The ALJ found that plaintiff did not have an

impairment or combination of impairments which met or equaled the requirements of the listing of

impairments. (A.R. 18-19). Plaintiff retained the residual functional capacity (RFC) for a limited

range of medium work, including a mental limitation of "no more than simple unskilled work."

(A.R. 19). The ALJ found that plaintiff's testimony regarding her subjective limitations was not

fully credible:

> The claimant testified that she is 26 years old, has a 3 year-old child, and completed high
> school in special education. She cannot read but can add, subtract and verify correct change
> in a store. Subsequent to the alleged onset of disability of September 8, 2004, she worked
> through a temporary service at a factory where her only problem was being allergic to dust.
> She testified that the duration of the job was more than 3 months but less than 6 months and
> that this work was in 2005. (However, her earnings record suggests that the work was in
> 2006, as will be discussed below). Work prior to the alleged onset of disability included
> packaging in a cookie factory for 4 or 5 months, that ended because she was late too often,
> and part-time work at Popeye's for three years, that ended due to a change in management.

> The claimant testified that she is prevented from working by narcolepsy and knee swelling.
> Functionally, she can walk a mile and lift 40 pounds. She has no trouble sleeping at night
> or in the day and, indeed, takes 4 naps. Her height is 5' 8" and she weighs her normal 216
> pounds. She cannot remember the name of her medication for arthritis which she has been
> taking for 6 months. It has helped a little in bringing her swelling down. She lives in a
> townhouse with her child and a sister. She drives alone to the store and can cook, clean, and
> vacuum. She also may walk to a store which is less than a mile away. Upon awakening at
> 11 a.m., she gets her son ready and makes him cereal. She l[ies] down from 3 p.m. to 7 p.m.,
> before giving her son dinner and a bath. She goes to sleep at 10 p.m. Her sister helps care
> for her son, including by reading to him. Her narcolepsy is getting worse, adding that
> Adderal was tried but did not help her stay awake. She had her tonsils and adenoids taken
> out. She never had a thyroid problem. She visits with friends and family in the area. The
> only time she fell asleep while driving was on the Saturday before the hearing after having
> [] two glasses of wine and [she had] been up until midnight the day before, which was her
> birthday.

* * *

The record shows that in February 2007 the claimant reported new symptoms of lightheadedness and having passed out as often as once a month since age 14, and being uncertain as to how long she may have been unconscious (Exhibit 14)[A.R. 306-25]. A study on February 8, 2007 after overnight CP[A]P titration demonstrated pathologic hypersomnia. There was no apparent EEG, incontinence, posturing and returning back to normal immediately upon awakening. A May 2007 study again demonstrated pathologic hypersomnia despite regular CPAP. However, as noted above, testing from the sleep disorder center in December 2007 indicated that the claimant's sleep apnea had been cured by a tonsillectomy. In assessing the severity of the claimant's sleep disorder of note is her testimony that the only time she fell asleep behind the wheel was after she ha[d] two glasses of wine and been up until midnight the day before.

Following complaints of pain in her neck, low back and left knee after a motor vehicle accident, an MRI of claimant's lumbar spine in March 2005 was essentially normal but an MRI of her left knee revealed significant ch[r]ondromalacia involving the patella. A cervical CT scan was essentially normal except for reversal of the normal lordotic curvature, most likely due to muscle spasms. Progress notes from September 2005 show complaints of pain with standing throughout the day and increased activity, with some clicking and popping in her left knee as she walks. Current diagnostic studies showed no significant findings except for a loose body within the left knee, possibly an osteoch[r]ondral defect of the patella of unknown age. Dr. Benjamin Stevens and Dr. Terrence J. Endres recommended physical therapy first and then possible surgical intervention (Exhibit 3F)[A.R. 143-46]. Physical therapy records show, however, that after claimant attended three visits, canceled three visits, and had one "no show," she was discharged in October 2005 for consistently missing appointment[s] despite rescheduling and promising to return (Exhibit 5F)[A.R. 157-66].

Records from Cherry Street Health Services show that claimant complained of worsening depression since the birth of her child in September 2004. After being started on Effexor and agreeing to seek counseling, she missed her first counseling appointment the following month. Progress notes from May 2005 show a follow-up for left leg pain, primarily in the knee. Depression is not mentioned until the following week when she described it as uncontrolled but improved. In August 2005, she first complained of feeling very sleepy and needing to be awake to take care of her child despite the depression with some help from her sister. She also reported left knee pain and locking with episodic "giving out" and, again, depression that was uncontrolled but improved (Exhibit 2F)[A.R. 129-41]. Additional treatment records from Cherry Street contain diagnostic imaging from September 2007 of the right knee that indicated normal results and the left knee revealed status postsurgical change in the proximal tibia; otherwise normal appearance of the left knee. Progress notes from October 2007 indicated some mild bilateral knee edma with a full range of motion without discomfort. The claimant also complained of back and bilateral ankle pain. X-rays of her lumbar spine and ankles, however, were normal (Exhibit 18)[A.R. 368-79]. Although I consider the claimant's leg pain to be a severe impairment, it does not compromise her

-5-

ability to perform basic work activities, given her testimony that she could walk a mile and lift 40 pounds.

During a forensic psychological evaluation in November 2005 the claimant reported depression since her teenage years that worsened after her son was born the prior year. In a report completed by Neil Reill[y], M.A., co-signed by James Lozer, Ed.D, a licensed psychologist, the claimant was assessed with major depression, recurrent and moderate; learning disabilities (self reported reading, writing and math); and cognitive disorder NOS (suspect borderline intellectual functioning). The claimant said she was tired all the time, had no energy or motivation, had problems getting up and tended to stay in bed all day. She also reported problems with concentration and forgetfulness, self-blame, guilt, sadness, daily crying spells, feelings of helplessness and hopelessness, and continued thoughts of suicide. Yet, she also reported a good relationship with the sister she lived with, a wonderful relationship with her son, and visiting her parents every three days. She had no current friends and never had many in the past. She related that she got along well with co-workers and bosses in the past. She watched television, listened to the radio, and played with her son. However, she no longer went out to eat, to the movies, or dancing. The evaluator assessed the claimant with thought processes that were concrete but logical and organized, with clear and understandable speech, and with memory and concentration that seemed poor (Exhibit 6F)[A.R. 162-72].

In January 2006, the claimant was administered the Wechsler Adult Intelligence Scale -3rd Ed. (WAIS-III) and achieved a full scale IQ of 59, with verbal and performance scores of 61 and 64, respectively, placing her in the mentally retarded range of intellectual functioning (Exhibit 7F)[A.R. 173-75]. Prior IQ testing when she was in the 9th grade indicated a full scale IQ of 67, which placed her in the borderline impaired range and qualified her for special education services as learning disabled (Exhibit 17F)[A.R. 342-66].

Reviewing DDS physicians concluded that the claimant could perform light work (i.e., lift up to 25 pounds occasionally and 10 pounds frequently; standing and/or walking for a total of six hours in a normal 8-hour workday) subject to limitations against concentrated exposure to hazards (Exhibit 8F)[A.R. 176-83] and on February 10, 2006 also limitations that were marked in the abilities to understand, remember, and carry out detailed instructions; and moderate in the abilities to remember locations and work-like procedures; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others (Exhibits 8F, 9F, and 10F, and 11F)[A.R. 176-203], while also noting that the claimant is non-compliant (Exhibit 10F)[A.R. 198-99]. To the extent that this expert evidence under SSR 96-6p can be construed as precluding unskilled work, it is not adopted since it is inconsistent with the claimant's activities, past and present.

The claimant's testimony of symptoms and functional limitations, when compared against the objective evidence and evaluated using factors in SSR 96-7p, is not credible in establishing disabling limitations, given especially her activities that include working for significant periods, including as a cashier and even as an assistant manager at a Walgreen[']s Store.  And while she had surgical procedures on her knee, she testified that she is able to walk a mile and lift 40 pounds.  Furthermore, the evidence of obstructive sleep apnea reflects only a mild condition (Exhibit 18F)[A.R. 368-79] and her narcolepsy does not prevent her from driving.

(A.R. 17, 19-21).  The ALJ found that plaintiff was not disabled at step 4 of the sequential analysis[2] because she was capable of performing her past relevant work as a cashier.  (A.R. 21).

## 1.

Plaintiff's arguments are based on evidence that she never presented to the ALJ.  (Plf. Brief at 6, 9; Reply Brief at 1-3).  This is patently improper.  It is clearly established law within the Sixth Circuit that the ALJ's decision is the final decision subject to review by this court in cases where the Appeals Council denies review.  This court must base its review of the ALJ's decision upon the administrative record presented to the ALJ.  The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's review is limited to the evidence presented to the ALJ.  *See*

---

[2]"Administrative law judges employ a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Social Security Act."  *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).  Under the sequential analysis, "The claimant must first show that she is not engaged in substantial gainful activity.  Next, the claimant must demonstrate that she has a 'severe impairment.'  A finding of 'disabled' will be made at the third step if the claimant can then demonstrate that her impairment meets the durational requirement and 'meets or equals a listed impairment.'  If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that she is incapable of performing work that she has done in the past.  Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.  The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work."  *White v. Commissioner*, 572 F.3d 272, 282 (6th Cir. 2009).

*Jones v. Commissioner*, 336 F.3d at 478; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *see also Osburn v. Apfel*, No. 98-1784, 1999 WL 503528, at * 4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [his] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ."). The court is not authorized to consider plaintiff's proposed additions to the record in determining whether the Commissioner's decision is supported by substantial evidence and whether the Commissioner correctly applied the law. *See Cline*, 96 F.3d at 148.

The last sentence of plaintiff's brief contains a passing request for alternative relief in the form of remand to the Commissioner "pursuant to either Sentence Four or Sentence Six of 42 U.S.C. Section 405(g)." (Plf. Brief at 14). Plaintiff's reply brief concludes with an identical request. (Reply Brief at 3). "A district court's authority to remand a case for further administrative proceedings is found in 42 U.S.C. § 405(g)." *Hollon v. Commissioner*, 447 F.3d 477, 482-83 (6th Cir. 2006). The statute permits only two types of remand: a sentence four (post-judgment) remand made in connection with a judgment affirming, modifying, or reversing the Commissioner's decision; and a sentence six (pre-judgment) remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision. *Hollon*, 447 F.3d at 486 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 99-100 (1991)). The court cannot consider evidence that was not submitted to the ALJ in the sentence four context. It only can consider such evidence in determining whether a sentence six remand is appropriate. *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster v. Halter*, 279 F.3d at 357.

Plaintiff has the burden under sentence six of 42 U.S.C. § 405(g) of demonstrating that the evidence she now presents in support of a remand is "new" and "material," and that there is "good cause" for the failure to present this evidence in the prior proceeding. *See Hollon*, 447 F.3d at 483; *see Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010). Courts "are not free to dispense with these statutory requirements." *Hollon*, 447 F.3d at 486. Plaintiff's initial brief ignores her burden under sentence six of 42 U.S.C. § 405(g). Her reply brief devotes a paragraph to the issue:

> To address the last argument in Defendant's Brief first, the Defendant claims that post-hearing evidence was not new or material and that there is no good cause for submitting it sooner. That boilerplate argument fails to consider the dates involved. The evidence that was submitted was (for the most part if not completely) evidence that was generated after the hearing date. Obviously, it could not have been submitted by Plaintiff before the ALJ made his decision. As a result, it would appear to meet the criteria of *Cotton v Sullivan*, 2 F.3d 692 (6th Cir. 692)[sic]. In fact, Plaintiff could not have submitted Exhibit A (which is attached) until recently; it is the latest decision by the Social Security Administration in her case. As this Court will note, the ALJ found, as the ALJ in this particular case should have found, that Plaintiff clearly met Listing 12.05C. This Court should note that Plaintiff was awarded benefits as of the day after the ALJ's Opinion, even though there apparently was virtually no new significant evidence in the file. Obviously, that decision raises grave questions about the validity of the ALJ's Decision in this case, since the Social Security Administration has in effect reversed the ALJ and tacitly acknowledged the lack of evidence in support of his findings.

(Reply Brief at 1-2). Perfunctory arguments are deemed waived, *see Geboy v. Brigano*, 489 F.3d 752, 767 (6th Cir. 2007), and the above-quoted argument certainly falls within that category. Plaintiff makes no attempt to address her burden with regard to each additional item of evidence offered. The one case mentioned, *Cotton v. Sullivan*, undermines plaintiff's stated position.[3]

---

[3]*Cotton* and numerous other Sixth Circuit cases *prohibit* this court from considering evidence that was not presented to the ALJ. *Cotton*, 2 F.3d at 696; *see Jones v. Commissioner*, 336 F.3d at 478.

Even assuming that plaintiff did not waive the issue, I recommend that plaintiff's request for a sentence six remand be denied because she has not carried her statutory burden. Plaintiff's argument that the subsequent award of social security benefits provides a basis for a sentence-six remand is utterly frivolous in light of controlling Supreme Court and Sixth Circuit authority.

In *Allen v. Commissioner*, 561 F.3d 646 (6th Cir. 2009), the Sixth Circuit held that a subsequent administrative decision awarding benefits does not satisfy the plaintiff's burden under sentence six: "[A] subsequent favorable decision itself, as opposed to the evidence supporting the subsequent decision, does not constitute new and material evidence under § 405(g)." 561 F.3d at 653. "Under sentence six, the mere existence of a subsequent decision in [plaintiff's] favor, standing alone, cannot be evidence that can change the outcome of h[er] prior proceeding. A subsequent favorable decision may be *supported* by evidence that is new and material under § 405(g), but the decision is not itself new and material evidence." 561 F.3d at 653. The Sixth Circuit explained that consideration of the result achieved on a subsequent application for benefits as "new evidence" under sentence six would be inconsistent with the statutory purpose of a sentence-six remand and would be contrary to controlling Supreme Court precedent:

> If a subsequent favorable decision -- separated from any new substantive evidence supporting the decision -- could itself be "new evidence" under sentence six, the only way that it might change the outcome of the initial proceeding is by the power of its alternative analysis of the same evidence. But remand under sentence six is not meant to address the "correctness of the administrative determination" made on the evidence already before the initial ALJ. [*Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991)]. In addition, it is overly broad to read the words 'new evidence' in sentence six to include a subsequent decision based on the same evidence. In *Melkonyan*, the Court noted that the legislative history of § 405(g) shows that "Congress made it unmistakably clear that it intended to limit the power of district courts to order remands for 'new evidence' in Social Security cases.'" *Id.* at 100.

-10-

561 F.3d at 653.

The mere fact of a subsequent favorable decision cannot be deemed "new evidence" under these authorities.  The only legitimate effect of the subsequent proceedings would arise from evidence considered in those proceedings that bears on plaintiff's condition on or before April 22, 2008.  The February 17, 2011 decision awarding benefits (docket # 16-1, ID#s 70-72) gave significant weight to the  July 2009, March 2010, and November 2010 records from Psychiatrist Nancy Pranger.  (docket # 16-1, ID#s 70-71)  Plaintiff did not submit any records from Dr. Pranger in support of her request for a sentence-six remand, and there is no evidence that the psychiatrist purported to address plaintiff's condition on or before April 22, 2008.  The February 17, 2011 decision awarding DIB and SSI benefits does not provide a basis for remanding this case to the Commissioner under sentence six of 42 U.S.C. § 405(g).

Plaintiff has not carried her burden under sentence six with regard to the materials she submitted to the Appeals Council.  None of the documents dated before April 22, 2008, are new because they were created before the ALJ entered his decision.  *See Ferguson*, 628 F.3d at 276; *Hollon*, 447 F.3d at 483-84.  The May 13, 2008 progress notes from Physician's Assistant Paul Bryant (A.R. 388), the Michigan Department of Human Services forms Mr. Bryant completed in 2009 (A.R. 394-95), and the August 25, 2009 letter from Nurse Practitioner Mary Barr (A.R. 392) are new.

Contrary to plaintiff's assumption, "good cause" is not established solely because evidence was not generated until after the ALJ's decision.  *See Courter v. Commissioner*, No. 10-6119, 2012 WL 1592750, at * 11 (6th Cir. May 7, 2012).  The Sixth Circuit has taken a "harder line."  *Oliver v. Secretary of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).  The

moving party must explain why the evidence was not obtained earlier and submitted to the ALJ before the ALJ's decision.  *See Ferguson*, 628 F.3d at 276; *Hollon*, 447 F.3d at 485.  Plaintiff provides no explanation why she waited until after the ALJ's decision to obtain these documents. She has not shown good cause.

Finally, in order to establish materiality, plaintiff must show that the introduction of the evidence would have reasonably persuaded the Commissioner to reach a different conclusion. *See Ferguson*, 628 F.3d at 276.  Plaintiff has not addressed, much less carried her burden with regard to materiality.

Nurse Practitioner Barr's August 25, 2009 letter indicates that plaintiff's medical condition had improved.  Her sleep apnea had been surgically cured.  (A.R. 392).  Barr stated that plaintiff had "the comoroidity of hypersomnia" and "a disrupted 24-hour sleep-wake cycle and narcolepsy with a mean sleep latency of 5 minutes."  (A.R. 392).  She also wrote that plaintiff had problems maintaining daytime wakefulness and regular sleep cycles, but was aware that she was "never to drive while drowsy."  (A.R. 392).  The nurse practitioner's statements are not supported by any new objective test results.  Further, a nurse practitioner is not an "acceptable medical source." See 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d); *see also Turner v. Astrue*, 390 F. App'x 581, 586 (7th Cir. 2010). Only "acceptable medical sources" can: (1) provide evidence establishing the existence of a medically determinable impairment; (2) provide a medical opinion; and (3) be considered a treating source whose medical opinion could be entitled to controlling weight under the treating physician rule.  *See Titles II and XVI: Considering Opinions and Other Evidence from Sources Who are not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, SSR 06-3p (reprinted at 2006

WL 2329939, at * 1 (SSA Aug. 9, 2006)).  The opinions of a nurse practitioner fall within the category of information provided by "other sources."  *Id.* at * 2; see 20 C.F.R. §§ 404.1513(d), 416.913(d).  The social security regulations require that information from other sources be "considered."  2006 WL 2329939, at * 1, 4 (citing 20 C.F.R. §§ 404.1512, .1527, 416.912, .927). This is not a demanding standard.  I find that the August 25, 2009 letter from Nurse Practitioner Barr would not have reasonably persuaded the Commissioner to reach a different decision on the issue of whether plaintiff was disabled on or before April 22, 2008.

On May 13, 2008, plaintiff reported to Physician's Assistant Bryant that "for the past month or two she ha[d] been experiencing migraine headaches twice a week."  (A.R. 388).  She also complained that she was depressed and had suicidal ideations.  Upon examination, Mr. Bryant found that plaintiff was awake, alert, and oriented in all three spheres.  She was "dressed neatly" and her eye contact was "fair to good."  Her motor behavior was appropriate.  Her affect was "somewhat dark."  Her thought processes were clear and she had no illusions, delusions, or hallucinations. Physician's Assistant Bryant provided plaintiff with prescriptions for amitriptyline and Imitrex for the reported migraine headaches.  In response to her complaints of increased depression, he gave plaintiff a prescription for Fluoxetine and referred her to counseling.  Mr. Bryant merely recorded plaintiff's subjective complaints.  His May 13, 2008 progress notes would not have reasonably led the Commissioner to reach a different decision on the issue of whether plaintiff was disabled on or before April 22, 2008.  The same is true for the Michigan Department of Human Services forms Mr. Bryant completed on February 11, 2009, and September 16, 2009.  (A.R. 394-95).  Mr. Bryant stated that plaintiff was ambulatory and did not require special transportation.  She was able to take care of her personal grooming needs, but required assistance with household tasks.  Mr. Bryant offered

his opinion that plaintiff was disabled.  (A.R. 394-95).  The issue of disability is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *see Courter*, 2012 WL 1592750, at * 8; *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).  Further, a physician's assistant is not an "acceptable medical source."  *See* 20 C.F.R. §§  404.1513(a), (d), 416.913(a), (d).  There is no treating physician's assistant rule and the opinion of a physician's assistant is not entitled to any particular weight.  *See Weaver v. Astrue*, 353 F. App'x 151, 154-55 (10th Cir. 2009); *see also*  2006 WL 2329939, at * 1, 4.  Mr. Bryant's  conclusion that plaintiff was disabled under state law in 2009 would not have reasonably persuaded the ALJ to reach a different conclusion on the issue of whether plaintiff was disabled under the Social Security Act on or before April 22, 2008.

Plaintiff has not demonstrated that remand pursuant to sentence six of  42 U.S.C. § 405(g) is warranted.  I recommend that plaintiff's motion for a sentence six remand be denied. Plaintiff's arguments must be evaluated on the record presented to the ALJ.

## 2.

Plaintiff argues that the ALJ committed reversible error "by failing to find that the Plaintiff met Listing 12.05B or C."  (Plf. Brief at 9).  It is well established that a claimant must show that she satisfies all the individual requirements of a listing.  *See Elam*, 348 F.3d at 125; *see also Perschka v. Commissioner*, 411 F. App'x 781, 787 (6th Cir. 2010).  The listing must be read as a whole and plaintiff had the burden of demonstrating that she met all parts of the listing.  "If all the requirements of the listing are not present, the claimant does not satisfy that listing."  *Berry v. Commissioner*, 34 F. App'x 202, 203 (6th Cir. 2002).  "It is insufficient that a claimant comes close to satisfying the requirements of a listed impairment."  *Elam*, 348 F.3d at 125.

"Listing 12.05 describes circumstances in which mental retardation is severe enough to preclude gainful activity." *Turner v. Commissioner*, 381 F. App'x 488, 491 (6th Cir. 2010). "The structure of listing for mental retardation is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). "[A] claimant will meet the listing for mental retardation only if the claimant's impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria." *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A); *see also Cheatum v. Astrue*, 388 F. App'x 574, 576 (8th Cir. 2010); *Randall v. Astrue*, 570 F.3d 651, 659-60 (5th Cir. 2009).

The specific requirements of listing 12.05 are as follows:

12.05  Mental Retardation: Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A.  Mental incapacity as evidenced by dependence on others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B.  A valid verbal, performance, or full scale IQ of 59 or less;

OR

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D.  A valid verbal, performance or full scale IQ of 60 though 70, resulting in at least two of the following:

    1.  Marked restriction of activities of daily living; or

    2.  Marked difficulties in maintaining social functioning; or

    3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.   Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Plaintiff argued in her prehearing brief and during the hearing that she should be found disabled because she met the requirements of listing12.05(C).  (A.R. 112-15, 400).  The ALJ found that plaintiff did not meet or equal the requirements of listing 12.05(C) or any other listed impairment:

> Evaluating claimant's impairments in the context of the Listings, the record does not contain the clinical signs and findings required to establish an impairment that meets the criteria of any of the Listings, including 11.03 and 12.05(C), as suggested by counsel (Exhibit 7E)[A.R. 112-13].  Furthermore, while the claimant has been diagnosed with narcolepsy, her condition is not comparable to 11.03, pertaining to a diagnosis of epilepsy.  Nor does the record document alteration of awareness or loss of consciousness and transient postical manifestations or unconventional behavior or significant interference with activity during the day as required by the listing.  Furthermore, the claimant drives and testified that the only time she fell asleep behind the wheel was after being up late and having consumed alcohol the night before.

> The claimant is learning disabled and testified that she cannot read.  While testing showed a Full Scale IQ of 67 in 1997 (Exhibit 17F/25)[A.R. 365] and 59 in January 2007 (Exhibit 7F/2)[A.R. 174] the claimant's work history shows a significantly higher level of functioning than these scores reflect, including at a Walgreen's Drug Store in 2001 as a cashier/assistant manager, working 30 hours a week, for a lengthy period, with earnings of $8,029.69 (Exhibit 3E)[A.R. 83-90].  Furthermore, the claimant's past obstructive sleep apnea and her testimony that she can't read suggests an explanation for her low scores on testing.

> In concluding that claimant's impairments do not meet or equal a listed impairment, I considered the opinions of the Disability Determination Services medical consultants who reached the same conclusion (Exhibits 9F and 10F)[A.R. 184-99], expert evidence that is consistent with the current overall record.

(A.R. 18-19).

Plaintiff disagrees with the ALJ's factual finding that her low IQ scores were not a valid indicator of her actual level of functioning.  (Plf. Brief at 9-12).  The ALJ found that plaintiff's work history showed "a significantly higher level of functioning than these scores reflect."  (A.R.

-16-

19; *see* A.R. 83-90, 117).  Plaintiff's school records state that her intellectual functioning was in the

borderline range rather than the mentally retarded range: "Terry's cognitive abilities have been

consistently measured in the borderline range." (A.R. 353; *see* A.R. 365-66).  Further, the ALJ noted

that plaintiff's "past obstructive sleep apnea and her testimony that she can't read suggest[ed] an

explanation for her low scores on testing." (A.R. 19).  The ALJ is responsible for making factual

findings regarding the validity of IQ scores, not the court.  *See Baker v. Commissioner*, 21 F. App'x

313, 315 (6th Cir. 2001)(citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *see also*

*Hancock v. Astrue*, 667 F.3d 470, 474 (4th Cir. 2012) (collecting cases); *Lax v. Astrue*, 489 F.3d

1080, 1087 (10th Cir. 2007) (same).  Plaintiff worked at or near the level of substantial gainful

activity as a cashier/assistant manager at a Walgreen's Drug Store.  (A.R. 21, 61, 83, 85).  She also

worked at other jobs where she was required to make change.  (A.R. 21, 77, 83-87).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Heston v. Commissioner*, 245 F.3d at 534; *see Rogers v. Commissioner*, 486 F.3d at

241.  The ALJ's finding that the work plaintiff had performed undermined the validity of her low

IQ scores is supported by substantial evidence.  Thus, the ALJ's finding that plaintiff did not meet

or equal the requirements of Listing 12.05 is supported by substantial evidence.

### 3.

Plaintiff argues that the Commissioner's decision should be overturned because the

ALJ "did not have substantial evidence to support his finding that Plaintiff could have performed

medium work, and his conclusion that she could violated the treating physician rule." (Plf. Brief at

9, 12).

A.    <u>RFC</u>

Plaintiff argues that the ALJ's finding that she retained the RFC for medium work is not supported by substantial evidence because her left knee impairment "obviously would have limited her abilities to stand, walk and lift." (Plf. Brief at 12). RFC is the most, not the least, a claimant can do despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); *Kornecky v. Commissioner*, 167 F. App'x 496, 499 (6th Cir. 2006). RFC is an administrative finding of fact reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Deaton v. Commissioner*, 315 F. App'x 595, 598 (6th Cir. 2009). "In formulating a residual functional capacity, the ALJ evaluates all the relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions." *Eslinger v. Commissioner*, No. 10-3820, 2012 WL 616661, at * 2 (6th Cir. Feb. 27, 2012). "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c); *see Norris v. Commissioner*, 461 F. App'x 433, 440 (6th Cir. 2012).

On September 6, 2005, plaintiff reported to physicians at Spectrum Health that she was unemployed and was questioning whether she could obtain disability based on her left knee problem. (A.R. 143). Plaintiff reported that she had no surgical history and no major illnesses. X-rays showed "no significant findings, except a loose body within the left knee, and possibly an osteochrondral defect of the patella of unknown age." (A.R. 144). The treatment plan was physical therapy with "focus on strengthening and taping the patella." (A.R. 144). Plaintiff attended only three physical therapy sessions, "canceled three visits, and had one 'no show.'" In October 2005,

Spectrum discharged plaintiff for "consistently missing appointment[s] despite rescheduling and promising to return. (A.R. 157).

Plaintiff omitted her treating surgeon's records from the evidence she submitted in support of her claims for DIB and SSI benefits. The fact of her left knee surgery and the likelihood that it was performed by orthopedic surgeon by Erik C. Hedlund, M.D., can be inferred from other medical records. A November 1, 2005 x-ray ordered by Dr. Hedlund showed no evidence of surgical hardware. (A.R. 287). December 28, 2006 x-rays showed satisfactory positioning of surgically implanted hardware. (A.R. 289). September 26, 2007 x-rays showed post-surgical changes, but an otherwise normal appearance. (A.R. 375). October 30, 2007 progress notes state that plaintiff had a full range of motion without discomfort. (A. R. 369). Further, plaintiff testified that she could walk a mile and lift 40 pounds. (A.R. 407). I find that there is more than substantial evidence supporting the ALJ's factual finding that plaintiff retained the RFC for medium work.

B.     Treating Physician

Plaintiff argues that the ALJ's factual finding regarding her RFC is not supported by substantial evidence because she "had a sleep disorder, and her treating specialist in that area, Dr. Marmion, indicated that she was still excessively sleepy during the day despite successful treatment of her sleep apnea." (Plf. Brief at 12). This argument cannot withstand scrutiny. Dr. Marmion never expressed an opinion that plaintiff was "excessively sleepy during the day" at any time after plaintiff's August 2007 tonsillectomy, which cured her sleep apnea.

On January 9, 2007, Dr. Marmion examined plaintiff on a referral from plaintiff's doctors at the Cherry Street Clinic. Dr. Marmion found that plaintiff was "alert, oriented and

cooperative" and had "normal speech and insight."  (A.R. 313).  Dr. Marmion recommended an

overnight sleep study, and if the study indicated sleep apnea, treatment by CPAP or tonsillectomy

would be considered.  (A.R. 313).  On February 1, 2007, Dr. Marmion noted that sleep studies

indicated "positional OSA" and he recommended that plaintiff avoid sleeping in the supine position.

(A.R. 312).  Two weeks later, Dr. Marmion noted that plaintiff's sleep study revealed  "mild" sleep

apnea.  He recommended that this condition be treated by nasal CPAP.  (A.R. 312).  On May 7,

2007, Nurse Practitioner Barr wrote that plaintiff had "improved greatly her compliance with

CPAP."  (A.R. 309).  Barr noted that plaintiff had twice been scheduled for surgery on her tonsils

and adenoids, but doctors canceled the procedures because plaintiff's hemoglobin levels were too

low.  (A.R. 309).

          The record contains an unsigned May 10, 2007 Multiple Sleep Latency Test (MSLT)

report from the Sleep Disorders Center.  The report states: "Multiple sleep latency study was

performed after overnight sleep at home with nasal CPAP.  Four-nap study was performed.  Mean

latency sleep onset was short at 5 minutes.  No REM sleep was recorded.  Impression: This study

demonstrates pathologic hypersomnia despite regular CPAP use.  The patient will be seen in

followup to discuss treatment options."  (A.R. 302, 325).

          On May 21, 2007, plaintiff complained to Dr. Marmion that she was experiencing

recurrent colds with a sore throat.  She complained of fatigue.  Dr. Marmion noted that plaintiff's

anemia could be causing the reported fatigue.  He suggested that plaintiff add vitamin C to the iron

she was already taking for her anemia.  He initiated a trial of the stimulant Ritalin.  He also changed

plaintiff's CPAP to a full face mask.  He encouraged plaintiff to maintain a more regular sleep

schedule and get to bed on time.  Dr. Marmion stated that plaintiff's sleep studies should be repeated

after her tonsillectomy.  (A.R. 308).  There are no medical records from Dr. Marmion dated after May 21, 2007.  (A.R. 308).

On May 22, 2007, Bohuslav Finta, M.D., of West Michigan Heart examined plaintiff with regard to her complaints that she had "'passed out' all her life.'"  (A.R. 210).  Plaintiff reported feeling fatigued.  She stated that she did not generally experience "chest discomfort, dyspnea, orthopnea, PND or peripheral edema." (A.R. 210).  Dr. Finta noted: "She does no regular physical activity.  She works doing hair.  She is raising a two-year-old son."  (A.R. 210).  Plaintiff's EEG returned normal results.  Plaintiff reported that she smoked a pack of cigarettes per day and was working in a hair salon.  She lived in an apartment with her son and a sister.  (A.R. 211).  Plaintiff was "well groomed, overweight, and in no acute distress."  (A.R. 211).  Her blood pressure was 114/80.  Her cardiac examination was normal.  She was diagnosed as having syncopal episodes of no clear etiology.  (A.R. 211).  Dr. Finta indicated that a stress echocardiogram would be performed to rule out any ischemic causes for plaintiff's symptoms.  A cardiac MRI would be performed to rule out structural heart disease.  (A.R. 211).  The MRI revealed no congenital structural cardiac abnormality.  (A.R. 207-09).  Plaintiff's electrophysiology studies returned normal results.  (A.R. 299-300).

 On July 2, 2009, plaintiff reported to Nurse Barr that she was not using the CPAP machine.  Barr advised plaintiff to use the machine, undertake a more regular sleep schedule, lose weight, and avoid operating heavy machinery when she felt sleepy.  (A.R. 307).

On August 23, 2007, Francis Hart, M.D., performed a tonsillectomy.  (A.R. 303-04).  On August 27, 2007, Nurse Barr met with plaintiff and "filled out the appropriate  paperwork" for the Michigan Department of Human Services:

Terry Beaty walked into the Sleep Disorder Center today.  She is having a great deal of difficulty with Department of Human Services in the State of Michigan.  Terry is extremely somnolent because of the untreated sleep apnea and she also has documented hypersomnia. She has a mean sleep latency of 5 minutes.  She is unable to use the CPAP regularly and has had an ENT-surgery seven days ago.  She is going to take at least six more weeks I think until she feels the effects of the surgery, as perhaps hopefully improving her nighttime sleep, we may need to test her again at that point.  We will see her at the end of September.  In the meantime, I have filled out the appropriate paperwork for the State of Michigan.

(A.R. 306).

A November 1, 2007 post-tonsillectomy sleep study revealed "mild snoring" and "no clinically significant evidence of sleep apnea."  (A.R. 374).  Plaintiff had normal sleep onset latency and normal REM onset latency.  Her sleep efficiency was "high at 92%."  (A.R. 374).

On November 27, 2007, Nurse Barr wrote a letter to plaintiff's attorney which stated that plaintiff "underwent nighttime sleep testing on November 1st 2007 and there [was] no evidence of clinically significant obstructive sleep apnea.  In other words, her sleep apnea ha[d] been cured through surgery."  (A.R. 340).  Barr wrote that an adjustment in plaintiff's stimulant dosage was under consideration:

However, we have established that she is excessively sleepy during the daytime hours, this was done on May 10th, 2007.  She has a mean sleep latency of five minutes in a series of four naps.  This does require treatment.

Terry is on treatment for this, but is not maintaining adequate wakefulness.  We are awaiting clearance from West Michigan Heart to make an adjustment in her stimulant dosage.  We do not want her to suffer any untoward affects, particular cardiovascular affects from the use of central nervous system stimulants.

(A.R. 340).

Dr. Marmion never offered an opinion that plaintiff could not stay awake and perform the requirements of work.  Nurse Barr's reliance on the May 10, 2007 study to support plaintiff's complaints of excessive sleepiness is undermined by her own August 2007 progress notes and Dr.

-22-

Marmion's May 2007 progress notes, both of which indicated that sleep studies should be repeated after plaintiff's tonsillectomy.  (A.R. 306, 308).  The November 1, 2007 post-tonsillectomy sleep study returned normal results.  On November 27, 2007, Nurse Barr indicated that as soon as West Michigan Heart gave cardiac clearance, plaintiff's Adderal dosage would be increased or a trial of another stimulant would be undertaken to address plaintiff's subjective complaints that she had difficulty staying awake.  (A.R. 373).  The opinions Nurse Barr expressed in her November 27, 2007 letter to plaintiff's attorney (A.R. 340) were not entitled to any particular weight.  Barr is a nurse practitioner.  She is not an acceptable medical source.  20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d); *see Turner v. Astrue*, 390 F. App'x at 586.  The treating physician rule does not apply to her opinions. *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011); *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007).  I find no basis for disturbing the Commissioner's decision denying plaintiff's claims for DIB and SSI benefits.

## **Recommended Disposition**

For the reasons set forth herein,  I recommend that  plaintiff's request for remand to the Commissioner under sentence six of 42 U.S.C. § 405(g) be denied.  I further recommend that the Commissioner's decision be affirmed.

Dated:   August 3, 2012                        /s/  Joseph G. Scoville
                                               United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file

timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).   General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).